No. 35,491

F. KELLY, O. A. COOK, J. B. SYFERT ·and RAY McCOMBS, *Appellants,* v. FRED MEYER et al., *Appellees.*

(134 P. 2d 658)

Opinion filed March 6, 1943.

*Harold W.* *McCombs,* of Russell, argued the cause for the appellants; *Ray McCombs,* of Ness City, was on the briefs *pro se.*

*Paul L. Aylward,* of Topeka, argued the cause for the appellees.

The opinion of the court was delivered by

PARKER, J.: This is an action for the recovery of damages for failure to comply with the terms of a written contract for the drilling of an oil and gas well, in which the defendant, Fred Meyer, recovered a judgment on his cross petition, alleging fraud, for part of the purchase price paid by him for certain oil and gas leases transferred to him by plaintiff under contract.

The petition was lengthy. Pertinent portions thereof were in sub-

stance as follows: The plaintiffs at all times material were the joint owners of a block of oil and gas mining leases, originally taken in January, 1939, on Kansas Producers 88 (B) forms, in the name of plaintiff, Kelly, for a term of ten years from date at one dollar per acre annual delay rentals, with an oral agreement a test well for oil and/or gas would be commenced on some part of the acreage block within a year or the leases surrendered and canceled of record, all of which facts were known to defendants.

The petition in substance further alleged: On June 16, 1939, the defendants Meyer and Simpson, representing themselves to be experienced oil men, doing business under the firm name of Fred Meyer, orally offered to drill a test well upon the lease block and pay a specified sum of money if plaintiffs would convey an interest in the drill site and certain specified leases. Other oral negotiations followed and the next day a written contract was entered into by the terms of which Meyer contracted to drill a test well, to be commenced within thirty days and be completed with diligence on an eighty-acre tract known as the "drill site" and to pay one dollar per acre for 4,875 acres of acreage, such tract to include all offsets to the site. In return plaintiffs were to transfer, and did transfer and deliver to Meyer, leases covering such amount of acreage, and conveyed to him an undivided one-half interest in the drill-site lease, placing the conveyance in a bank in McCracken, Kan., under an escrow agreement that if a test well were not commenced in thirty days it was to be returned to the grantors. In event of default plaintiffs would be damaged to an extent not then determinable but as a part of the damages defendants were to immediately reconvey all interests transferred to them.

The petition further alleged: Full performance on part of plaintiffs and failure to perform by defendants. A demand for and refusal of a reconveyance of all instruments of conveyance with willful intent to prevent completion of a test well within the year and before the date for paying delay rentals. That by reason of such default and failure to perform, plaintiffs were prevented from drilling a well on such block, or from procuring others to do so, during the first year of the term of the leases, resulting in damages to them as follows: $35,000, for reasonable and actual cost of drilling a well, $48,750, for the reasonable and actual value of the leases transferred to defendants, $30,925, for the reasonable and actual value of leases in the block retained by plaintiffs which also became value-

less, and $10,000, for punitive or exemplary damages. The prayer of the petition was for $124,675, with interest at the legal rate from date of filing of the petition.

The petition contained numerous other allegations not required for our purposes, together with full copies of the contract, the escrow agreement and the written demand made for a return of the conveyances.

The answer and cross petition filed by Meyer on November 5, 1940, was as protracted as the petition. Many allegations therein contained can be omitted, but it contained in substance, including a general denial, the following pertinent statements: There existed between defendant Simpson and plaintiffs a conspiracy or agreement whereby the former was employed to sell Meyer the acreage described in the petition, and be paid for his services out of proceeds of the sale. Pursuant to such arrangement, on behalf of and with knowledge of plaintiffs, Simpson falsely and fraudulently represented to Meyer he was employed by a major oil company interested in buying fifteen hundred acres of leases in the Brownell block, being plaintiffs' acreage, and employed him for the sum of $500 to check the block for possibility of oil production. Meyer performed such work and when finished Simpson falsely and fraudulently represented his company desired the acreage referred to and would pay ten dollars per acre for same, but suggested Meyer buy all of plaintiffs' acreage at one dollar per acre and he would purchase one-half thereof from him. Later Simpson produced and exhibited a forged letter purporting to be signed by his company authorizing him to buy and pay ten dollars per acre for fifteen hundred acres out of such block. On June 16, 1939, Simpson brought Meyer to plaintiffs, and after some negotiating he agreed to buy their block of leases. The next day Simpson took Meyer to plaintiffs, who submitted a contract for execution. In the presence of plaintiffs Simpson stated he had the deal finished and it was to Meyer's interest to sign. Thereupon, after receiving assurances from one of the plaintiffs regarding Simpson's reliability and receiving an oral promise of the assignment of two additional quarters as an inducement, Meyer signed the contract. At that time Simpson gave plaintiffs a check for $1,100.

The answer in substance further alleged: Payment by Meyer June 19 of the balance of $3,775. Ascertainment of falsity of Simpson's representation of employment by the oil company and its interest in any leases. Demand upon plaintiffs for return of his money on

grounds the same had been obtained by them and Simpson by fraud and false pretenses. Failure on part of plaintiffs to turn over the leases contracted for, due to nonownership of some described in the contract, and willingness at all times to turn back all leases received by him. Execution of the contract in reliance upon false and fraudulent representations of plaintiffs and Simpson. Also nonexistence of any partnership relation between him and Simpson and the charge the latter was at all times acting under authority of plaintiffs.

The substance of the allegations of the cross petition were: Damages arising from false and fraudulent representations as alleged in answer in the sum of $1,000 for expenses and in addition the $3,775 received by plaintiffs under the contract.

The reply was a general denial, a specific denial of conspiracy with or employment of Simpson, a specific denial of any agreement to assign more leases to Meyer than were delivered, and an allegation of full compliance with all terms of the contract.

Later an amendment to the reply was filed containing a notice from Meyer dated July 12, 1939, directed to and received by plaintiffs wherein he refused to proceed with the drilling of the well as contracted "for the reason that the undersigned was induced to enter into said contract through false pretenses which were well known to you and each of you and in which you and each of you participated at the time said contract was entered into," and an allegation that prior to the filing of his answer Meyer had never claimed the contract was breached for any reason other than that stated in the notice and was estopped from claiming it was breached on grounds other than those specifically designated in the written notice.

Before trial plaintiffs dismissed as to defendant Simpson. On the issue recited the case was then tried to a jury, which returned a verdict for defendant in the sum of $3,775, the exact amount paid plaintiff, and judgment of the court, after overruling of a motion for a new trial, was rendered accordingly. From this judgment plaintiffs appeal.

Appellants strenuously urge various matters which they contend entitle them to a new trial. Three of their objections have considerable merit and are entitled to special consideration.

The pleadings in this case were lengthy and included allegations which should on proper motion have been stricken. However, no such motions were made. Notwithstanding this situation the trial court in its first instruction simply copied their language instead of

outlining in substance the issues as presented by the evidence. As set out in the printed pages, they cover nineteen pages. An examination of these pleadings, and in particular the allegations of the answer and cross petition, easily leads to the conclusion that in the form given this instruction served to reëmphasize the claim of fraud as made by the appellee. We are aware of our decisions holding it is not error to incorporate the pleadings in instructions when they are in plain and simple language and when the issues are fairly presented by the whole instructions. (*Williamson v. Oil and Gas Co.*, 94 Kan. 238, 146 Pac. 316; *Shouse v. Consolidated Flour Mills Co.*, 128 Kan. 174, 179, 277 Pac. 54; *Balano v. Nafziger*, 137 Kan. 513, 21 P. 2d 896.) The difficulty we find in applying that rule to the instruction in question is that the allegations of the answer as incorporated therein were not short and concise but long and ambiguous— not plain and simple but intricate and complicated. Under such conditions we believe it is far better practice to refrain from giving instructions which include the pleadings in full. See *Macy v. Citizens State Bank*, 123 Kan. 651, 256 Pac. 809; *Moore v. Owens*, 143 Kan. 620, 56 P. 2d 86; *Lewis v. Montgomery Ward & Co.*, 144 Kan. 656, 663, 62 P. 2d 875, and *Lukens v. First National Bank*, 151 Kan. 937, 944, 101 P. 2d 914. If appellants had objected to this instruction when given, either specifically or by a request for another, or if they had sought to exclude evidentiary matter from the answer by proper motion we might say more on this subject. As it is, the objection here made by appellants for the first time is not reviewable (*Lukens v. First National Bank*, supra).

Appellants' next objection is that the trial court erred in limiting the cross-examination of defendant Meyer. A careful examination of the record convinces us this objection is indeed serious. One of the principal questions for determination by the jury was the relationship of Simpson to the parties. Appellants contend he was Meyer's partner and that the two were doing business under the firm name of Fred Meyer, while Meyer contends Simpson was in fact plaintiffs' agent or partner and had conspired with them to defraud him. With the exception of admissions alleged to have been made by McCombs, one of the appellants, to one of the appellees' witnesses this case insofar as fraud and the existence of the partnership relation were concerned depended wholly upon Meyer's unsupported testimony. He took the stand in his own behalf and testified at great length to statements made to him by Simpson, admissions of

conspiracy alleged to have been made by several of the appellants, and vehemently denied that he had ever been Simpson's partner at any time.

On cross-examination of Meyer the following transpired:

"Q. At any rate, after you had been out there a few days, you started looking around for some leases of your own, did you not? A. That's not true.

"Mr. Aylward: Object to that as not cross-examination. A. That's not true.

"The Court: All right; go ahead and answer it.

"Q. Didn't you go to see a man named Painter, down there?

"Mr. Aylward: I object to that for the same reason.

"The Court: Sustained."

Early in the trial by stipulation of the parties the testimony of one Painter, witness for plaintiffs, was taken in the presence of the court but in the absence of the jury, with the understanding that if otherwise competent it might be admitted in evidence at the proper time. The substance of this testimony was as follows: That he was a farmer and filling-station operator, residing at Brownell, Kan.; that he owned a farm; that sometime during the month of June (1939), while he was building a fence along the Ness county line, Meyer and Simpson stopped and asked him about land in the territory where he owned a half section; they inquired about two or three other near-by tracts of land; they said they were out looking around and that they would be back in a few days and they would try to lease the land owned by the witness; that they came back to see him in three or four days or inside of a week; they wanted to know if the witness would lease his land to them; that they came back the following morning about sunup, June 17, 1939, and wanted to go and have the lease made out; that he and his wife went with them to Ransom; but they couldn't get anyone up there to notarize the papers and they drove on to Ness City, where they signed the lease; that he never gave either Meyer or Simpson but one lease.

He further testified as follows:

"Q. Was anything said during your conversation with Mr. Meyer or Mr. Simpson, as to whether or not they were jointly interested in the lease? A. Well, they said they was going to put down an oil well out there where this derrick was. That's the way I understood them.

"Q. At the time you first talked to them, did they say anything to you with reference to where they had to go or about them having to go someplace in the meantime? A. Well, they just asked me about this Kelly and asked me about an attorney over at Ness City.

"Q. What attorney did they ask you about? A. They asked me who an attorney was over there, and I told them I just didn't really know; I lived in Trego County then, and I wasn't well acquainted.

"Q. What did they ask you about Mr. Kelly? A. They just said something about him starting an oil derrick and not finishing it, and they wanted to get ahold of it. They understood he wasn't going to finish it.

"Q. Go ahead. A. That's about all they were inquiring about.

"Q. And didn't they say something about they wanted to get ahold of it? A. They was wanting to find out who the head man was, as well as I remember."

On cross-examination, the witness testified that when he went to Ransom with Simpson and Meyer, on June 17, they arrived at Ransom about sunup and there was nobody up, so they drove on to Ness City and arrived there about 7 o'clock, where they executed the lease; and then Simpson took them home; Meyer said he had other business there in Ness City and he didn't go.

At the time this testimony was taken appellee moved this witness' testimony be stricken out and withheld from the jury on the ground it did not prove or disprove any issue in the case and was incompetent, irrelevant and immaterial. Later when this evidence was offered by appellants, after appellee had put on all his evidence in support of his answer and cross petition, this objection was renewed and the trial court sustained it, thereby preventing any of this testimony from going to the jury.

After sustaining the objection to this testimony appellants offered in evidence a certified copy of an oil and gas lease, dated June 17, 1939, of record in the office of the register of deeds of Ness county, Kansas, from Painter and wife to Meyer Production Company. Appellee objected on the ground it had to do with a collateral matter and was not proper rebuttal. The objection was sustained.

It has been shown that the determination of the instant case was bound to turn largely on the credence the jury would attach to the testimony of the appellee. Appellee contends that the question asked Meyer, and to which objection was sustained, was improper cross-examination. They then contend that even if it were not, it pertained to a collateral matter and objection should have been sustained on that ground. We are not so certain of that. The partnership relation was one of the principal questions at issue and this question had to do with that relationship. Be that as it may, if appellee is correct in its last contention—which we do not admit— we do not think our decisions sustain his position.

In *Tawzer v. McAdam*, 134 Kan. 596, 7 P. 2d 516, this court held:

"Where determination of the main issue of fact must largely depend upon the credence to be accorded to the testimony of a litigant who is the principal

witness in his own behalf, a wider range of cross-examination should be allowed than is commonly permitted in the cross-examination of witnesses in general.

"Under the circumstances of this case, it is held that the cross-examination of plaintiff and principal witness in his own behalf was unduly and prejudically restricted." (Syl. ¶¶ 2, 3.)

And in the opinion it was said:

"It is no answer to defendants' complaint touching the restrictions placed upon the cross-examination of plaintiff to say that the questions sought to elicit matters not touched on in plaintiff's direct examination. The case was bound to turn largely on the credence the jury would attach to the testimony of plaintiff. For that reason defendants were entitled to discredit plaintiff's testimony in his own behalf by a searching cross-examination—if they could. (*McIntosh v. Oil Co.*, 89 Kan. 289, 131 Pac. 151, 47 L. R. A., n. s., 730 and note; *Zinn v. Updegraff*, 113 Kan. 25, 213 Pac. 816; *Reeser v. Hammond*, 122 Kan. 695, 253 Pac. 233.) *It is a salutary rule of trial practice that when a party is a witness in his own behalf, and where the issues of fact must largely turn on the credence which the triers of fact will give to his testimony, the fullest inquiry should be permitted on cross-examination to discover not only the accuracy of his understanding, but his memory and his credibility as well. To that end he may be cross-examined on collateral matters which may throw light upon the matters in issue.*" (Italics supplied.) (p. 603.)

Also in *Wood v. McKeever*, 141 Kan. 323, 327, it was held:

"While the extent of the cross-examination of witnesses is largely governed by the discretion of the trial court, a more searching cross-examination of a witness who is a party principal in the litigation is usually permitted; and in the instant case the plaintiff's complaint touching the restriction of the cross-examination seems well founded. (*Brown v. Meyer*, 137 Kan. 553, 561, 21 P. 2d 368.)"

Likewise, in *Zinn v. Updegraff*, 113 Kan. 25, 37, 213 Pac. 816, it was said:

"The extent to which one may be allowed to go in the cross-examination of a party to a suit rests largely in the discretion of the trial court; but should not be restricted in matters which materially affect the credibility of the witness upon a material question, which is controverted in the case. In this case the question of care or lack of care of the plaintiff was one of the important matters to be considered by the jury for its bearing upon his testimony as to the negligence of defendant, and his own negligence, if any. The jury, of course, had to weigh his testimony. The question of his conduct in handling a motorcycle, and especially the question of whether or not he had been arrested and plead guilty and paid a fine for violation of statutes or ordinances pertaining to careless or improper methods of riding a motorcycle, were all proper matters for the jury to have in considering the weight of the testimony, and it was error to sustain the objection to these questions."

In the case at bar questions tending to show dealings with Painter and the eventual execution of the Painter lease in the name of Meyer

Production Company, as well as attempts to procure other leases, in view of Meyer's denial of the partnership relation, were all proper matters for the jury to have in considering the credence to be given his testimony and the limiting of the cross-examination as to such questions was error requiring a reversal of the judgment.

Heretofore we have set out certain testimony to which the court sustained objection. The ruling on this evidence is cited as error and it was duly presented on the motion for a new trial.

What was the situation when Painter's testimony and the certified copy of the oil and gas lease were offered? Appellee had just put on his evidence in support of his cross petition. As to it the burden of affirmative proof was on him. Can it be said that appellants were bound to anticipate all he would prove and meet it in advance of that proof? For that matter can it be said with assurance the proffered testimony was rebuttal? Could it not be claimed with as much propriety that it was evidence offered in defense against the the appellee's cross petition. We feel in view of all the facts it should have been so considered.

Nor are we ready to say this testimony was not proper rebuttal. We are cognizant of the general rule that the plaintiff should introduce all his evidence in chief while making out his case, but there is another rule equally as important that general rules of practice with regard to the order of proof must be enforced or relaxed by the court in the furtherance of justice and are not to be applied with such technical precision and unbending rigor as to produce injustice. Inasmuch as Meyer had denied the partnership and later recovered on his cross petition because of appellants' lack of proof as to that relationship we are not so sure that was not the result here. The testimony of Painter, backed by the record in the office of the register of deeds which could not be impeached, might have been the turning point in the minds of the jury. It was evidence the jury should have had before it if the issues were to be fairly and justly determined.

In *Eames v. Clark*, 104 Kan. 65, 177 Pac. 540, an action for damages for negligent operation of an automobile resulting in the death of a boy, the negligence relied upon was that the defendant's car was going too fast, and the rate of speed was one of the matters sought to be established by the evidence in chief. The defendant testified he was only going six or seven miles an hour, although plaintiff had adduced evidence showing he was traveling about twenty-five miles per hour at the time of the accident. In rebuttal

the plaintiff offered the testimony of an expert witness to show the defendant's claim as to speed was not true. The testimony was objected to as not proper rebuttal. On appeal this court said:

"It is true the ultimate purpose of the excluded evidence was to support the claim of the plaintiff that the car was going too fast, and the rate of speed was one of the matters sought to be established by his evidence in chief. But in offering the expert witness he was undertaking to counteract or impair the effect of the defendant's testimony, not by merely producing cumulative evidence—more evidence of the kind he had already introduced—but by showing the falsity of the specific testimony attacked. This he could not have done sooner, for he could not anticipate the details of the defendant's narrative." (p. 68.)

In the absence of more specific cases we are not without applicable rules which have been laid down in well-established treatises on general law. In 64 C. J. 152 we find the following:

"Either party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible, although it tends to support his case in chief. The fact that it was not then introduced does not make it discretionary with the trial court, subsequently to exclude it . . ."

Likewise, on page 157 of the same volume, it is said:

"One cannot be permitted to gain an unfair advantage by withholding evidence improperly, but material evidence proper in chief ought not be rejected merely because not offered until rebuttal not kept back by trick and where its reception will not prejudice the adverse party. The admission, in rebuttal, of evidence proper in chief has been held not objectionable where such evidence was inadvertently omitted, or was erroneously rejected when offered at the proper time, where the adverse party is given an opportunity to reply to it, or does not object, or where it is necessary to arrive at the truth. Where plaintiff has made out a prima facie case which defendant has attacked, plaintiff may introduce additional evidence which would have been admissible on the first examination, . . ."

In view of all the circumstances as they appear from a careful examination of the record we conclude the Painter testimony should have been permitted to go to the jury.

The judgment is reversed and the cause remanded for a new trial.